NORTHERN STATES POWER
COMPANY, d/b/a Xcel
Energy, Appellant,

v.

MINNESOTA METROPOLITAN
COUNCIL, Respondent,

Minnesota Department of
Transportation, et al.,
Respondents.

No. C4–03–67.

Court of Appeals of Minnesota.

Aug. 19, 2003.

Timothy R. Thornton, Thomas J. Basting, Jr., Briggs & Morgan, P.A., Minneapolis, MN, for appellant.

Lewis A. Remele, Jr., Andrew L. Marshall, Bassford, Lockhart, Truesdell & Briggs, P.A., Minneapolis, MN, for respondent Minnesota Metropolitan Council.

Mike Hatch, Attorney General, David M. Jann, Ann K. Bloodhart, Assistant Attorneys General, St. Paul, MN, for respondent Minnesota Department of Transportation.

Considered and decided by SCHUMACHER, Presiding Judge, HUDSON, Judge, and FORSBERG, Judge.*

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

## OPINION

HUDSON, Judge.

Appellant Northern States Power, now known as Xcel Energy, challenges the district court's dismissal of its writ of mandamus. Xcel Energy argues the district court erred by holding that (1) there is no factual dispute in this matter; (2) Xcel Energy's claim is premature and speculative; and (3) Xcel Energy has an adequate legal remedy. Appellant also argues that the district court improperly considered evidence outside the four corners of Xcel Energy's verified petition. We reverse and remand.

## FACTS

The Hiawatha Light Rail Transit project (LRT) is an 11.6–mile mass-transit system that will connect downtown Minneapolis to the Minneapolis/St. Paul International Airport and the Mall of America. Respondent Minnesota Department of Transportation (MNDoT) is overseeing the design and construction of the light-rail line, and co-respondent Minnesota Metropolitan Council (Met Council) will own and operate the transit system once it is operational.

LRT's current route through downtown Minneapolis takes the train down Fifth Street and in close proximity to the underground electrical substation owned by Xcel Energy.[1] The substation is comprised of four massive power transformers, each of which weighs 120 tons and is four stories tall. The transformers are housed in a subsurface vault under the plaza in front of Xcel Energy's office complex at Fifth Street and Nicollet Avenue. Xcel Energy operates this facility pursuant to a franchise agreement with the City of Minneapolis. The franchise agreement states that in exchange for an annual $18 million franchise fee, Xcel Energy has the right to use the city's "streets, alleys and public grounds" in order to distribute power in Minneapolis.

The substation is the source of 80% of downtown Minneapolis's energy. The transformers are designed in such a way that it would take a simultaneous failure of three transformers before there was a disruption in the downtown area's power supply. The roughly 1,000 similar transformers in service elsewhere enjoy a one percent failure rate. Although the transformers in Minneapolis have never needed to be replaced, statistical failure rates indicate that one transformer will need to be replaced every 25 years. Three of Xcel Energy's transformers were installed in the 1960's, and the fourth was put in place in the mid–1980's.

Replacing one of the transformers requires Xcel Energy to obtain a city permit to close Fifth Street so that it can be torn up in order to access the transformers. Because failed transformers cannot be repaired in place, two 300–ton capacity cranes must then be positioned on Fifth Street to lift the transformer out. With the construction of LRT, Fifth Street would still need to be closed off and torn up, but Xcel Energy would now need to position the two 300–ton capacity cranes on the LRT tracks in order to access the transformers. In addition, once the cranes are in place, the crane booms must be extended over the transformer vault to extricate the transformers; thus LRT's poles and overhead wires must be removed. The entire process would take approximately two months. Xcel Energy maintains that LRT's installation on Fifth Street will prevent the utility from setting up the equipment needed to access and

---

1. The track bed on Fifth Street was constructed during the spring and summer of 2002. The rail and overhead catenary (power) wires are presently being installed.

replace their transformers. Without the Met Council's or MNDoT's permission to shut down train service and remove the train equipment from Fifth Street, Xcel Energy claims it could not access the transformers to perform these time-consuming and critical projects. Therefore, Xcel Energy argues, power supply dependability is seriously compromised, and its substation is rendered essentially worthless.

In 1999, the parties began trying to negotiate an agreement to ensure the utility's reasonable access to its substation. These initial discussions focused on moving the substation itself; however, the parties were unable to agree on their respective financial responsibilities for such an endeavor. The Met Council ultimately requested federal funding for the LRT initiative, but it did not seek funds to help offset the cost of moving the substation. Xcel Energy then refused to move its equipment without a guarantee of reimbursement. Xcel Energy brought suit against MNDoT, the Met Council, and the Federal Transportation Agency (FTA) in federal district court, seeking compensation for the cost of relocating its substation. However, in 2002, all three defendants were granted summary judgment.

Xcel Energy then filed a verified petition for alternative writ of mandamus in Hennepin County District Court seeking to compel MNDoT and Met Council to initiate inverse-condemnation procedures, arguing that the ability to access its substation is a property right, and that respondents' refusal to guarantee access renders the substation worthless. In lieu of an answer, the Met Council and MNDoT moved to dismiss for failure to state a claim.

In granting respondents' motion to dismiss, the district court concluded that (1) Xcel Energy did not have a right to unfet-tered access to its property; (2) the LRT project did not change the ultimate fact that in order to access its equipment, Xcel Energy would still need to acquire a permit from the city, and Xcel Energy had produced no facts to suggest the construction of the light-rail line would make the acquisition of this permit any more difficult; (3) injunctive relief provided Xcel Energy with an adequate legal remedy; and (4) Xcel Energy's petition was premature and speculative because the overhead wires are removable and the track beds have been designed to withstand the increased loads of the cranes—thus Xcel Energy has reasonable access. This appeal follows.

## ISSUES

I. Did the district court err when it declined to apply the legal standard governing summary judgment to respondent's rule 12 motion when it accepted and considered extrinsic evidence submitted by the Met Council?

II. Did the district court err by ruling that the construction of the light rail transit system does not unreasonably restrict appellant's access to its underground substation?

III. Did the district court err by ruling that appellant had an adequate remedy at law and its petition was premature and speculative?

## ANALYSIS

### I

Following Xcel Energy's filing of the petition for mandamus, MNDoT and Met Council moved to dismiss for failure to state a claim pursuant to Minn. R. Civ. P. 12.02(e). The district court, however, accepted extrinsic evidence submitted by Met Council, including an affidavit from

the LRT project director, Edward Hunter, which stated that the contractors had been directed to provide *removable* supports for the overhead wires in order to accommodate substation access. Thus, the first issue we address is whether the district court erred by considering evidence outside the four corners of Xcel Energy's petition for mandamus. Xcel Energy argues that the district court committed reversible error by considering extrinsic evidence submitted by respondents. In particular, Xcel Energy claims the district court impermissibly relied on the Hunter affidavit to reach its conclusion that LRT's overhead wires and supporting structures are removable, and that the track beds can support the cranes and other equipment necessary for repairing the transformers. At a minimum, Xcel Energy argues that, upon accepting the Hunter affidavit, the district court should have treated the rule 12 motion as a summary judgment motion.

██ On a motion to dismiss, the only question before the court is whether the petition states a legally sufficient claim for relief. *Elzie v. Comm'r of Pub. Safety,* 298 N.W.2d 29, 32 (Minn.1980). When deciding whether to grant a motion to dismiss pursuant to Minn. R. Civ. P. 12.02(e), the district court is only to consider the evidence alleged in the petition. *In re Milk Indirect Purchaser Antitrust Litig.,* 588 N.W.2d 772, 775 (Minn.App.1999). A claim prevails against a motion to dismiss if it is possible on any evidence that is consistent with the plaintiff's theory to grant relief. *Geldert v. Am. Nat'l Bank,* 506 N.W.2d 22, 25 (Minn.App.1993). And the allegations contained in the pleading must be considered as true and viewed in the light most favorable to the pleader. *N. Star Legal Found. v. Honeywell Project,* 355 N.W.2d 186, 188 (Minn.App.1984), *review denied* (Minn. Jan 2, 1985). Signif-

icant to our analysis here, rule 12.02 requires the court to regard a motion to dismiss as a summary judgment request when matters outside the pleadings are presented to and not excluded by the court. Minn. R. Civ. P. 12.02.

██ Here, as Xcel Energy accurately notes, the district court considered extrinsic evidence submitted by respondents. Among other evidence, the district court considered the affidavit of MNDoT's expert, Edward Hunter. Hunter's affidavit directly contradicts Xcel Energy's claim that LRT's poles and wires are not removable, and that therefore the location of LRT's poles, wires and tracks significantly impedes Xcel Energy's access to the downtown substation. We conclude that by considering evidence not found within Xcel Energy's petition, the district court changed this proceeding from a motion to dismiss under rule 12, to a request for summary judgment pursuant to rule 56. Thus, the district court erred by not applying the summary judgment standard. Therefore, on appeal, we will review the district court's determination under the summary judgment standard. *Peoples State Bank Truman v. Triplett,* 633 N.W.2d 533, 537 (Minn.App.2001), *review denied* (Minn. Oct 16, 2001).

**II**

██ On an appeal from summary judgment, we ask two questions: (1) whether there are any genuine issues of material fact, and (2) whether the district court erred in its application of the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990).

A motion for summary judgment shall be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that

either party is entitled to a judgment as a matter of law. On appeal, the reviewing court must view the evidence in the light most favorable to the party against whom judgment was granted.

*Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993) (citation omitted). A genuine issue of material fact exists when the nonmoving party presents evidence that creates a doubt as to a factual issue that is "probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions." *DLH, Inc. v. Russ,* 566 N.W.2d 60, 71 (Minn.1997).

 Mandamus is an extraordinary remedy that should only be awarded

> upon a showing that a party has suffered harm that is direct, substantial and peculiar * * * in that it differs markedly from the damages suffered by the public at large.

*Vern Reynolds Constr., Inc. v. City of Champlin,* 539 N.W.2d 614, 617 (Minn. App.1995) (quotation omitted), *review denied* (Minn. Dec. 20, 1995). Mandamus is available only to compel a duty clearly required by law. *Zaluckyj v. Rice Creek Watershed Dist.,* 639 N.W.2d 70, 74 (Minn. App.2002), *review denied* (Minn. Apr. 16, 2002). It is, however, the proper vehicle to assert for a claim of inverse condemnation. *Vern Reynolds,* 539 N.W.2d at 616. To obtain mandamus relief the petitioner must show

> (1) the failure of an official duty clearly imposed by law; (2) a public wrong specifically injurious to petitioner; and (3) no other adequate specific legal remedy.

*Walther v. Lundberg,* 654 N.W.2d 694, 697 (Minn.App.2002).

At the heart of this controversy is Xcel Energy's contention that LRT's installation on Fifth Street will deny Xcel Energy reasonable access to its substation, rendering it worthless. Therefore, Xcel Energy claims, the construction of LRT represents a taking entitling the utility to just compensation. As the district court properly found, Xcel Energy has a right to access its underground substation in a reasonable, convenient manner and government actions that unreasonably interfere with this right constitute a taking. The difficult question presented on appeal here, however, is what constitutes "reasonable access" to this very unique property? Or, put another way: does the installation of LRT's poles, wires, and track beds so restrict the right of access to Xcel Energy's substation as to require compensation under the Minnesota Constitution?

## A. Eminent Domain / Taking

 The Minnesota Constitution requires the government to pay a property owner just compensation when the government performs an act that, although in the public good, takes, damages or destroys private property. Minn. Const. art. I, § 13. A claim for inverse condemnation is appropriate when a government entity appropriates the land without formally exercising its power of eminent domain. *Vern Reynolds,* 539 N.W.2d at 616.

But not every annoyance and inconvenience with the use and enjoyment of one's property that is caused by a government action requires compensation. *Alevizos v. Metro. Airports Comm'n of Minneapolis & St. Paul,* 298 Minn. 471, 486–87, 216 N.W.2d 651, 662 (1974). Any statement of what constitutes property is "nebulous at best," and not every economic or social advantage is a property right that must be compensated when it is taken. *Id.* at 485, 216 N.W.2d at 661.

 We also note, however, to be a taking that requires compensation under the Minnesota constitution, the taking need not be a taking in a strictly physical

sense. *Johnson v. City of Plymouth,* 263 N.W.2d 603, 605 (Minn.1978). A constitutional taking can also arise out of interference with the ownership, possession or enjoyment of the property. *Id.* Property owners have a right of reasonable, convenient and suitable access to the public streets that abut their property. *County of Anoka v. Esmailzadeh,* 498 N.W.2d 58, 60 (Minn.App.1993), *review denied* (Minn. May 28, 1993); *Hendrickson v. State,* 267 Minn. 436, 446, 127 N.W.2d 165, 173 (1964).

## B. Reasonable Access

What constitutes reasonable access depends on the nature of the property itself. *Johnson,* 263 N.W.2d at 605. Clearly, this case involves a very unique factual situation. Xcel Energy's characterization of its substation as a "special use property" is quite apt, making this case very different from the typical access dispute. For example, this controversy does not involve the mere re-routing of a road or other traffic control device that makes access to a particular piece of property more difficult. *See Id.* (a property owner was not entitled to compensation despite the fact that a city's decision to install curbs and gutters along on the streets abutting the owner's business restricted the owner's access to his property because the city's project did not substantially diminish access to the property); *County of Anoka v. Blaine Bldg. Corp.,* 566 N.W.2d 331, 336 (Minn.1997) (holding loss of traffic access to property from one side of the highway caused by the construction of a highway median does not constitute a taking requiring compensation where the corporation still enjoyed reasonable access to its business from the other side of the road). By contrast, here we are presented with a complex government mass-transit project that may or may not prevent reasonable access to a massive power-distribution facility. There are few cases in

Minnesota, or elsewhere, that present similar facts.

We do, however, find the supreme court's decision in *Alevizos* helpful in analyzing this case. In *Alevizos,* property owners in south Minneapolis, whose property was situated under or near the Minneapolis–St. Paul Airport's take-off and landing flight paths, filed a petition for a writ of mandamus claiming that the operation of the airport interfered with their use and enjoyment of their property "to such an extent as to amount to a taking." *Alevizos,* 298 Minn. at 473–75, 216 N.W.2d at 655–56. The district court dismissed the petition concluding that a physical trespass had not taken place. *Id.* at 477, 216 N.W.2d at 657. The supreme court held that although not every inconvenience entitles a property owner to relief, relief should be granted where the property owner could show

> a direct and substantial invasion of his property rights of such a magnitude he is deprived of the practical enjoyment of the property and that such invasion results in a definite and measurable diminution of the market value of the property. To justify an award of damages it must be proved that these invasions of property rights are not of an occasional nature, but are repeated and aggravated, and that there is a reasonable probability that they will be continued in the future. We recognize that with the test we have prescribed there may well be a dispute as to the property, if any, that is to be included in the inverse condemnation proceedings.

*Id.* at 487–88, 216 N.W.2d at 662. The *Alevizos* court remanded the matter to determine whether facts existed to show the airport had indeed adversely affected the plaintiffs' land. *Id.* at 488, 216 N.W.2d at 663.

California has recently dealt with similar issues in addressing the effects of the construction of a light-rail line in the Los Angeles area. Although not controlling, these cases also aid our analysis here. In *Perrin v. Los Angeles County Transp. Comm'n*, 42 Cal.App.4th 1807, 50 Cal. Rptr.2d 488, 489 (1996), a property owner brought an inverse condemnation claim alleging that the installation of a light-rail line in front of her business unreasonably blocked access to her property and diminished the property's value. The train eliminated parking on the side of the street where the property was located, and the installation of a guard rail and concrete divider made it more difficult for pedestrians to cross the street. *Id.* at 489–90. Although the train made access more inconvenient, because access had not been denied altogether, the California court held that the train did not substantially impair access to the property. *Id.* at 492–93, *see also Brumer v. Los Angeles County Metro. Transp. Auth.*, 36 Cal.App.4th 1738, 43 Cal.Rptr.2d 314, 322 (1995) (construction of light rail train that eliminates vehicles' ability to pass and park directly in front of the property was not a substantial impairment because facts did not demonstrate customers' access would actually be diminished). Finally, in *Lane v. San Diego Elec. Ry. Co.*, 208 Cal. 29, 31–35, 280 P. 109 (Cal.1929), the California Supreme Court held that installation of a train turnaround loop placing the train's tracks across a business's driveway constituted a substantial impairment.

 As the district court correctly found, Xcel Energy has a right to reasonable access to its Fifth Street substation. To establish a taking, the court in *Alevizos* required a direct and substantial invasion of property rights, resulting in a measurable diminution of market value of the property. *Alevizos*, 298 Minn. at 487, 216

N.W.2d at 662. Xcel Energy has arguably satisfied this test. Here, Xcel Energy alleged facts in its petition that could prove LRT construction and installation substantially impairs Xcel Energy's access to its property. Specifically, Xcel Energy has presented evidence that could lead a fact finder to conclude that LRT's poles, wires and tracks present a physical barrier to accessing the substation, resulting in a significant diminution of market value to this "special use" property.

Respondents claim, however, that LRT's wires, tracks and poles do not impose an unreasonable impediment because LRT has been designed so the poles and wires on Fifth Street can be removed to allow access to the substation. Likewise, respondents claim that the track beds have been constructed to sustain the weight of the cranes necessary to extricate a damaged transformer. But Xcel Energy fiercely denies this claim.

Xcel Energy notes that the Hunter affidavit is the basis for respondents' claim that the wires are removable and the track beds are properly reinforced. That affidavit, however, was improperly considered by the district court in the context of respondents' rule 12 motion. But even on its merits, Xcel notes that the affidavit states that the LRT track bed *could* be designed to withstand the weight of the cranes; nothing in the record—according to Xcel Energy—suggests that the LRT track bed *has* been so constructed. Thus, Xcel Energy continues to maintain that LRT's wires and track beds are not removable and indeed create a physical barricade preventing Xcel Energy's access to its substation.

Respondents also claim that LRT's presence on Fifth Street does not unreasonably block access to Xcel Energy's property, because removing or repairing a transformer has always been an incredibly

challenging undertaking that requires the appropriate permits from the City of Minneapolis. In other words, according to respondents, nothing has changed; Xcel Energy must still get a permit from the City of Minneapolis to tear up Fifth Street. While this is true, respondents' position appears to assume that LRT's poles and wires are removable and thus Xcel Energy has no significant additional impediment to accessing its substation as a result of LRT. Again, this assumption is hotly disputed by Xcel Energy.

In our view, the parties' insistence on their respective positions illustrates the materiality of the factual dispute—that is: whether the construction and installation of LRT denies Xcel Energy's reasonable access to its downtown substation. Because under rule 56, all facts must be viewed in a light most favorable to Xcel Energy, on this record, we conclude that Xcel Energy has produced sufficient facts in its petition to present a material factual dispute as to the question of whether Xcel Energy has been denied reasonable access to its property. This factual dispute can only be answered in trial, and thus the district court erred in dismissing Xcel Energy's mandamus petition.

### III

Xcel Energy also challenges the district court's conclusion that Xcel Energy has an adequate legal remedy. The district court concluded that should respondents deny Xcel Energy access to its substation at some future date, Xcel Energy could seek injunctive relief. As previously stated, mandamus is an extraordinary remedy and is only to be granted where the party seeking mandamus has no other legal remedy. *Walther*, 654 N.W.2d at 697.

Xcel Energy claims that the critical nature of its downtown substation makes injunctive relief impracticable be-

cause any impediment in its ability to access the transformers in a timely fashion creates a risk to the downtown's power supply. Xcel Energy asserts that, if forced to ask for MNDoT's or the Met Council's permission or seek injunctive relief, critical time in replacing a damaged transformer would be lost. Xcel Energy also argues that it faces a literal, physical barrier to its substation; not just a procedural/administrative one.

Xcel Energy's argument has merit. It is true, Xcel Energy does not have an unfettered right to access the substation any time it wants, and it must seek a permit from the City of Minneapolis in order to close the city's street to repair the transformers. But it is unreasonable to require Xcel Energy to first seek permission from respondents to access its property and be denied before granting Xcel Energy relief. A property owner is entitled to seek mandamus if it becomes obvious that the state's proposed plans will cause a future, substantial loss of access to his or her property. *See Hendrickson v. State by Mondale*, 267 Minn. 436, 127 N.W.2d 165 (1964) (holding that mandamus may be appropriate if highway construction plans show that access to a property will be limited to such an extent that there was no longer reasonably convenient and suitable access to the property).

Similarly the district court erred in concluding Xcel Energy's claim was premature and speculative. Writs of mandamus are to be issued only when the government actions have inflicted actual harm on the property and not on speculative possible future harms. *Thomsen v. State by Head*, 284 Minn. 468, 472, 170 N.W.2d 575, 578–79 (1969). Here, like other cases where the appellate courts have found actual-present harm done to a property owner's interests, Xcel Energy

has suffered real, actual harm by virtue of the construction and installation of LRT. LRT is more than a proposed plan. The tracks are in and the poles and wires will soon be installed. It appears—viewing the facts in a light most favorable to Xcel Energy—that the LRT wires are not removable and the tracks cannot withstand the weight of the cranes necessary to repair a damaged transformer. Thus, Xcel Energy has already suffered a real, substantial loss of access to its property. The Minnesota Supreme Court has held that mandamus was appropriate where the government designed and constructed an interstate in such a way that access to a grocery store was no longer accessible except via a "very circuitous route." *Johnson Bros. Grocery Inc. v. State Dept. of Highways,* 304 Minn. 75, 77–78, 229 N.W.2d 504, 505 (1975). Likewise in *County of Anoka v. Esmailzadeh,* the court held that a taking occurred where a highway construction made it nearly impossible to access the plaintiff's business. *Esmailzadeh,* 498 N.W.2d at 61–62. Similarly here, respondents have designed LRT in such a way that it creates a physical barrier to Xcel Energy's property. Just as we would not require a store owner

to wait until customers were actually thwarted in their attempts to reach a store before seeking relief, it is unreasonable to expect Xcel Energy to wait until its substations have failed and the utility is unable to access them for extrication before we determine whether its right of access has in fact been unreasonably denied.

## DECISION

Because the record demonstrates that there are material facts in dispute as to whether the installation of LRT along Fifth Street in downtown Minneapolis unreasonably denies Xcel Energy access to its property, and because the district court erred in finding that Xcel Energy's claim was premature and that Xcel Energy had an adequate legal remedy, we reverse and remand for further proceedings.

**Reversed and remanded.**