**NORTHERN STATES POWER
COMPANY, d/b/a Xcel
Energy, Respondent,**

v.

**MINNESOTA METROPOLITAN
COUNCIL, Appellant,**

**Minnesota Department of
Transportation, et al.,
Appellants.**

No. C4–03–67.

Supreme Court of Minnesota.

Aug. 5, 2004.

Timothy R. Thornton, Edward Stringer, Thomas J. Basting, Jr., Bryant D. Tchida, Briggs & Morgan, Minneapolis, MN, for Respondent.

Lewis A. Remele, Jr., Charles E. Lundberg, Andrew L. Marshall, Bassford Remele, P.A., Minneapolis, MN, for Appellant Minnesota Metropolitan Council.

Mike Hatch, Attorney General, David M. Jann, Stuart Alger, Assistant Attorneys General, St. Paul, MN, for Appellant Department of Transportation.

Thomas L. Grundhoefer, St. Paul, MN, Jay Heffern, Minneapolis City Attorney, Corey M. Conover, Assistant City Attorney, Minneapolis, MN, Manuel Cervantes, St. Paul City Attorney, Gerald T. Hendrickson, Deputy City Attorney, St. Paul, MN, for Amicus Curiae League of Minnesota Cities and City of St. Paul.

OPINION

PAGE, Justice.

This case arises out of the construction of the Hiawatha Light Rail Transit line (LRT), which will eventually connect downtown Minneapolis with the Minneapolis–St. Paul International Airport and the Mall of America.[1] The Minnesota Department of Transportation (MnDOT) is responsible for the line's construction. Upon completion, the line will be owned and operated by the Minnesota Metropolitan Council (Met Council).

On April 2, 2002, respondent Xcel Energy filed a verified petition for an alternative writ of mandamus in Hennepin County District Court seeking to compel MnDot and the Met Council to initiate inverse condemnation proceedings.[2] The petition alleges that the "LRT route * * * will block access necessary to maintain, repair, and service Xcel Energy's downtown electrical substation." Xcel claims that it has a property interest in reasonable access to the substation, which MnDOT and the Met Council unconstitutionally took by blocking access to the substation and "refus[ing] to enter into an enforceable access agreement resolving Xcel Energy's right of access."[3] The peti-

---

1. Since this action was commenced, construction of the downtown segment of the LRT line has been completed and LRT service began on June 26, 2004.

2. Inverse condemnation is an "action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency." *Alevizos v. Metro. Airports Comm'n*, 298 Minn. 471, 477, 216 N.W.2d 651, 657 (1974) (quoting *Thornburg v. Port of Portland*, 233 Or. 178, 376 P.2d 100, 101 n. 1 (1962)).

3. More specifically, Xcel alleges:
   3. The Fifth Street LRT track and overhead catenary wires will block Xcel Energy's access to and from the Downtown Substation. Access from Fifth Street is the only feasible means for repairing and replacing the Downtown Substation's power transformers. Access to property from an abutting public roadway and access to the abutting public roadway from the property are property rights, the taking of which requires just compensation. *Hendrickson v. State*, 267 Minn. 436, 127 N.W.2d 165, 169 (1964).
   4. Met Council and State Defendants have refused to ensure that Xcel Energy will be afforded necessary access to the Downtown Substation in the event of a transformer failure. Unless LRT is shut down west of Nicollet Mall and the overhead wires between Nicollet Mall and Hennepin Avenue [are] removed, Xcel Energy cannot repair and replace the Downtown Substation transformers. Although Xcel

tion further alleges that the failure of MnDOT and the Met Council to provide an affirmative guarantee of access caused Xcel to suffer a "substantial and measurable decline" in the value of its downtown substation. Xcel seeks compensation both for the claimed loss of access to the substation and for the claimed diminution in the substation's market value.

In lieu of filing an answer, MnDOT and the Met Council each moved to dismiss the petition pursuant to Minn. R. Civ. P. 12.02. Accompanying the motions was an affidavit from Edward Hunter, the project director for the Hiawatha Corridor Light Rail Transit Project. The affidavit is dated April 19, 2002. According to the affidavit, Xcel provided MnDOT "specific vehicle weights, crane lifting clearances, substation weights, and point-load requirements for future removal of transformers from the substation." In the affidavit, Hunter asserts that the LRT was designed to "allow the overhead structures of the light rail system to be taken down * * * to allow cranes to access the substation," and "so that the weights and loading requirements provided by Xcel could be accommodated without damage to the [LRT] system."

Xcel urged the district court not to consider Hunter's affidavit or, alternatively, to allow it additional opportunity to conduct discovery to respond to the affidavit. The district court did not grant Xcel additional time to conduct discovery.[4] Subsequent to the Hunter affidavit, Xcel did, however, submit an affidavit dated May 15, 2002, from James Kucera, its project director for LRT. In his affidavit, Kucera stated, among other things, that the LRT would

Energy has repeatedly attempted to negotiate an agreement regarding assured access and although Met Council and State Defendants have represented to Xcel Energy that a non-judicial resolution to the access problem would be desirable, after more than a year of discussions and proposed agreements, Met Council and State Defendants have stonewalled regarding assumed access. Met Council's most recent proposal forces Xcel Energy to pay LRT construction costs and defers resolution of the other issues. Unless LRT construction accommodates access to the Downtown Substation, the facility must be abandoned and replaced.

5. Despite their intention of blockading the substation, Met Council and State Defendants have failed to initiate eminent domain proceedings to compensate Xcel Energy for the loss of reasonable and necessary Fifth Street access to and from the Downtown Substation.

6. Met Council and State Defendants have also failed to initiate eminent domain proceedings to compensate Xcel Energy for the substantial decline in market value to the Downtown Substation caused by the prevention of transformer repair and replacement that will be occasioned by LRT construction and operation.

4. Of note is the fact that since at least February 2001 Xcel, MnDOT, and the Met Council were engaged in protracted litigation in both federal and state court over the location of Xcel's utility facilities and the construction of the LRT line. See N.S.P. Co. v. Minnesota Metro. Council, 667 N.W.2d 501, 505 (Minn. App.2003); N.S.P. Co. v. Fed. Transit Admin., Civ. No. 01–295 (D.Minn. May 24, 2001) (memorandum opinion). At some point during the construction of the LRT line, the Commissioner of the Minnesota Department of Transportation ordered Xcel to relocate its utility facilities beneath Fifth Street to allow for the construction of LRT. N.S.P. Co. v. Fed. Transit Admin., et al., 270 F.3d 586, 587 (8th Cir.2001). As a result, Xcel brought suit in federal court seeking compensation for the cost of relocation. Id. During the pendency of that suit, MnDOT and the Met Council sought an injunction to compel Xcel to move electric transmission lines and related equipment that lay under Fifth Street. Id. Xcel then attempted to amend its federal complaint to include an inverse condemnation claim for the costs of relocating its downtown substation. The court denied that motion, which prompted Xcel to bring the instant suit in state court.

"prevent access from Fifth Street necessary in order to remove, repair, and replace" Xcel's transformers. Aside from stating that the overhead wires are too low to allow the cranes to access the substation, the Kucera affidavit did not otherwise describe how the LRT would block Xcel's access. Taking the Hunter and Kucera affidavits into consideration, the district court issued an order dated October 28, 2002, dismissing Xcel's petition. The district court found that MnDOT and the Met Council's actions did not amount to a taking of reasonable access to Xcel's substation and that, in any case, such a claim was premature and speculative. In dismissing the petition, the district court applied Minn. R. Civ. P. 12.02.

On appeal, the court of appeals concluded that the district court erred by considering the Hunter affidavit on a Rule 12 motion and therefore addressed the motions applying the Rule 56 standard for summary judgment. *N.S.P. Co. v. Minnesota Metro. Council,* 667 N.W.2d 501, 506 (Minn.App.2003). Applying the summary judgment standard, the court of appeals held that fact issues existed as to whether the LRT obstructed Xcel's access to its downtown substation and whether that obstruction rose to the level of a taking. *Id.* at 510. The court stated that, because the poles and tracks for LRT were in place, Xcel "suffered a real, substantial loss of access to its property" and therefore lacked an adequate legal remedy. *Id.* at 511. We granted MnDOT and the Met Council's petition for review and now reverse.

The LRT line runs east and west through downtown Minneapolis along Fifth Street. At the intersection of Fifth Street and the Nicollet Mall, the tracks for the LRT trains and the overhead catenary (power) lines that power the trains run in close proximity to Xcel's underground electrical substation. The substation consists of four four-story-tall electrical transformers, each weighing over 120 tons. The transformers lie in a vault underneath a plaza adjacent to Xcel's downtown Minneapolis offices. Eighty percent of the electrical power supplied to downtown Minneapolis passes through this substation.

Three of the transformers were installed in the 1960s and one was installed in the 1980s. At the time of Xcel's petition, the substation was operating at capacity. The four transformers are designed to be redundant, such that three would have to fail before the city experienced a disruption in its power supply. To date, none of the transformers have failed.

According to Xcel's petition, Xcel must have access to its downtown substation in order to repair or replace a transformer if one were to fail. A failed transformer cannot be repaired in place, but must be lifted out of the vault and repaired offsite. A temporary replacement transformer may be placed in the vault while the failed transformer is being repaired. Removal of a failed transformer requires the use of one or two 300–ton cranes that must be placed on Fifth Street. Placement of the cranes on Fifth Street will require the removal of the LRT trains' overhead catenary lines and support poles. It will also require the disruption of LRT service west of Nicollet Mall for the entire time the cranes are in place.[5] Removal of the failed transformer and installation of a temporary replacement transformer take approximately 30 days. Once repaired, the same amount of time is required to remove the temporary replacement and reinstall the repaired transformer.

---

**5.** We take judicial notice that the LRT line ends two blocks west of the Nicollet Mall.

Before placing its cranes on Fifth Street, Xcel must perform certain site preparation work. That work includes removal of the plaza's surface above the substation, removal of large concrete panels located above the transformers, and preparation of the failed transformer for removal. All of this preparation work would be performed on Xcel's property and would not require the removal of the catenary lines or placement of cranes on Fifth Street. The Hunter affidavit asserts, and nothing in the record contradicts, the fact that "[u]nder the shortest of the time periods provided by [Xcel], [MnDOT or the Met Council] could remove the overhead catenary in the area adjacent to the Fifth Street substation before [Xcel] was ready to move its crane into the area."

Xcel operates its substation and electrical grid pursuant to a franchise agreement with the City of Minneapolis. Under the agreement, Xcel may "construct, install, enlarge, operate, repair and maintain in, on, over, under and across the streets, alleys and public grounds of the City, an electric distribution system and electric transmission lines, including * * * transformers." Mpls. Ord. 93–Or–180, § 1. The agreement goes on to state that Xcel's use of the streets "shall be subject to reasonable regulations by the City Council and shall be consistent with the use of the streets for proper street purposes by the public." *Id.* According to the affidavit submitted by Deputy City Engineer Brian Lokkesmoe, the City of Minneapolis also requires that Xcel obtain an obstruction permit to divert traffic on Fifth Street, pay a fee for the obstruction of Fifth Street, and pay for any street restoration costs necessitated by Xcel's work in removing its

transformers. *See also* Mpls. Ords. §§ 429, 430.[6] The affidavit indicates that Xcel will have to follow the same permitting procedure when the LRT is operational. The record does not specify what, if any, permitting procedure Xcel would have to follow with the Met Council to obtain permission to place its cranes on that portion of the street on which the LRT's tracks lie. However, in its mandamus petition, Xcel alleges that it had been negotiating with MnDOT and the Met Council for over a year to obtain "assured access" to its downtown substation. The petition also alleges that those negotiations, up to the time of the petition, failed to produce an agreement.

I.

■ As a threshold matter, we must determine whether the district court erred when it considered the Hunter and Kucera affidavits in ruling on MnDOT and the Met Council's motions to dismiss. A Rule 12.02 motion to dismiss for failure to state a claim upon which relief can be granted will be denied "if it is possible on any evidence which might be produced, consistent with the pleader's theory, to grant the relief demanded." *N.S.P. Co. v. Franklin*, 265 Minn. 391, 395, 122 N.W.2d 26, 29 (1963). Rule 12.02 provides that such a motion shall be treated as a motion for summary judgment and disposed of as provided in Rule 56 if matters outside the pleadings are submitted to the district court for consideration and not excluded. We have noted, however, that a court may consider documents referenced in a *complaint* without converting the motion to dismiss to one for summary judgment. *See Martens v.*

---

**6.** The ordinance allows the city engineer to impose "reasonable conditions upon the issuance of the permit * * * to protect the public health, safety, and welfare, to insure the structural integrity of the right-of-way, to pro-tect the property and safety of other users of the right-of-way, and to minimize the disruption and inconvenience to the traveling public." Mpls. Ord. 430.50.

*Minnesota Mining & Mfg. Co.,* 616 N.W.2d 732, 739 n. 7 (Minn.2000).

MnDOT cites *Martens* for the proposition that a court may consider any document attached to any pleading on a motion to dismiss. MnDOT argues that, because the Hunter affidavit was attached to and referenced in its motion to dismiss, the district court properly considered the affidavit without converting the motion to one for summary judgment.

MnDOT's reliance on *Martens* is misplaced. Rule 12.02 states:

> If, on a motion asserting the defense that the *pleading* fails to state a claim upon which relief can be granted, matters outside the *pleading* are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 * * *.

(Emphasis added.) Under a plain reading of this language, it is clear that the referenced "pleading" is the pleading that is the subject of the motion to dismiss. In *Martens,* we limited "our review to the particular documents and oral statements referenced in the complaint," the pleading that was the subject of the motion to dismiss. 616 N.W.2d at 739 n. 7. Here, the affidavits considered by the district court were not referenced in or a part of the pleading that was the subject of the motion to dismiss. Thus, having considered the affidavit, it was error for the district court not to have treated the motion as one for summary judgment under Rule 56.

## II.

■ On appeal from summary judgment, we consider (1) whether there are any genuine issues of material fact for trial and (2) whether the lower courts erred in their application of the law. *Bank Mid-* *west, Minnesota, Iowa, N.A. v. Lipetzky,* 674 N.W.2d 176, 179 (Minn.2004). Although we review evidence in the light most favorable to the nonmoving party, summary judgment cannot be defeated with "unverified and conclusory allegations or by postulating evidence that might be developed at trial." *Funchess v. Cecil Newman Corp.,* 632 N.W.2d 666, 672 (Minn.2001).

■ Actions for inverse condemnation may appropriately be brought by writ of mandamus. *Wolfram v. State by Burnquist,* 246 Minn. 264, 267 n. 2, 74 N.W.2d 510, 512 n. 1 (1956). Mandamus is an extraordinary remedy, *State v. Pero,* 590 N.W.2d 319, 323 (Minn.1999), that is available only to compel a duty clearly required by law. Minn.Stat. § 586.01 (2002). In order to obtain mandamus relief, a petitioner must show that the defendant: (1) failed to perform an official duty clearly imposed by law, *id.;* (2) that, as a result, the petitioner suffered a public wrong specifically injurious to the petitioner, *State ex rel. Coduti v. Hauser,* 219 Minn. 297, 302, 17 N.W.2d 504, 507 (1945); and (3) that there is no other adequate legal remedy. Minn.Stat. § 586.02 (2002). Minnesota Statutes § 586.03 (2002) requires that an alternative writ of mandamus shall "state concisely the facts showing the obligation of the defendant to perform the act, and the defendant's omission to do so." Generally, mandamus will not issue to compel a public official to do an act absent a request having been made upon the officer to do the act. *Alevizos v. Metro. Airports Comm'n of Mpls. & St. Paul,* 298 Minn. 471, 496, 216 N.W.2d 651, 666–67 (1974). We have identified two exceptions to this general rule. No request is necessary when a public duty, rather than a private duty, is involved.[7] *Id.,* 216 N.W.2d at 667.

---

7. We have defined a "public duty" to be one

that is specifically stated in the law itself and

Nor is a demand required when such a demand would be futile. *Id.,* 216 N.W.2d at 667.

### III.

We now turn to the merits of Xcel's petition. Xcel's takings claim has two aspects. Xcel focuses primarily on its claim that its access to Fifth Street, for use in repairing a failed transformer, has been physically taken by the placement of LRT train tracks on Fifth Street, by operation of LRT trains on those tracks, and by the construction of the overhead catenary lines.[8] In essence, Xcel's argument is that the LRT line creates a physical barrier that cannot be removed, making it impossible to place cranes necessary for the repair of a failed transformer on Fifth Street. Intertwined with this physical takings claim is what Xcel alludes to as a regulatory takings claim. Xcel's "regulatory takings" claim is that, although it [Xcel] has repeatedly attempted to negotiate "assured access," the Met Council and MnDOT have refused to "ensure that * * * necessary access will be afforded in the event of transformer failure * * *." Each of these claims will be addressed in turn.

Viewed in the light most favorable to Xcel, the record does not establish that the placement of the LRT train tracks on Fifth Street, the operation of trains on those tracks, or the construction of the overhead catenary lines will physically prevent Xcel from placing its cranes on Fifth Street for purposes of removing a failed transformer. While Kucera's May 15 affidavit makes the conclusory allegation that the "LRT track, train, and overhead wires will physically prevent Xcel energy from accessing the Downtown Substation transformers from Fifth Street," it does not explain how that access will be prevented. In contrast, the Hunter affidavit details how the LRT was designed, based on Xcel's submissions, so that the system would physically allow Xcel's cranes to access its substation in the event of a transformer failure. Moreover, the Kucera affidavit does not allege, nor is there any other evidence in the record rebutting the Hunter affidavit's assertions that: (1) the LRT project's design/build contractor was provided with the information necessary to build the LRT in a way that would support the cranes used to remove a transformer from the substation and allow for the removal of the overhead catenary lines and poles; (2) the design/build contractor was directed to construct the LRT roadbed so that "the weights and loading requirements provided by Xcel could be accommodated without damage" to the LRT system; and (3) based on Xcel's estimate of the time required to prepare the surface above the transformers for the removal of a transformer, there was ample time to "remove the overhead catenary lines" before Xcel would be ready to place cranes on Fifth Street. At oral argument, Xcel asserted that the operation of the LRT prevented access to its substation because the LRT trains, unlike motor vehicle traffic, cannot be diverted from Fifth Street west of Nicollet Mall. Implicit in that argument is the notion the LRT trains must,

that does not result in a benefit or burden upon any particular person so that no particular person has the right to demand performance. *State ex rel. Currie v. Weld,* 39 Minn. 426, 428, 40 N.W. 561, 562 (1888).

8. MnDOT argues that Xcel's takings claim must fail because Xcel has no property right to "occupy Fifth Street for private business operations." However, because our disposition does not turn upon the extent of Xcel's property interest in reasonable access to Fifth Street, we will assume, for purposes of discussion only, that Xcel has such a right.

without exception, travel to the end of the LRT line two blocks west of the Nicollet Mall. Upon questioning, however, Xcel acknowledged that the trains could be stopped at a point east of the Nicollet Mall. Obviously, if the LRT trains are stopped east of the Nicollet Mall, they will not be a physical barrier to placing cranes on Fifth Street for purposes of removing or replacing a transformer. Finally, Xcel does not provide an explanation as to how the LRT train tracks create a physical barrier to placing cranes on Fifth Street. As the Met Council noted in its brief:

> The rails themselves are recessed, so they are flush with the street. Even if the track bed were not reinforced to meet Xcel's specifications, which it is, the only result would be that the tracks themselves could be damaged. It would not prevent cranes from crossing the tracks. Xcel would face the same situation as any other land owner doing construction in downtown Minneapolis— which is that damage to the roadway may occur during a construction project.

Because the record does not contain any genuine issues of material fact that support Xcel's contention that the LRT line creates a physical barrier to the placement of cranes on Fifth Street for purposes of removing or replacing transformers at its downtown electrical substation, we conclude, as did the district court, that Xcel's physical takings claim is both premature and speculative. In that its physical takings claim is premature and speculative, Xcel cannot satisfy any of the requirements for obtaining mandamus relief at this time. Thus, while dismissal of the petition as it relates to Xcel's physical takings claim was improper under Minn.

R. Civ. P. 12.02, dismissal is nonetheless appropriate under Minn. R. Civ. P. 56.[9]

▮ Xcel's "regulatory takings" claim also fails. Xcel's mandamus petition notes that it "ha[d] been attempting to resolve the access issue for over a year" and that "Met Council and [MnDOT] have refused to ensure that Xcel Energy will be afforded necessary access to the Downtown Substation in the event of a transformer failure." The petition does not allege that either MnDOT or the Met Council have refused to negotiate over the access issue, have negotiated in bad faith, or have categorically refused to grant Xcel access. Indeed, based on its petition, Xcel cannot make such allegations. In its petition, Xcel states:

> Although Xcel Energy has repeatedly attempted to negotiate an agreement regarding assured access and although Met Council and State Defendants have represented to Xcel Energy that a nonjudicial resolution to the access problem would be desirable, after more than a year of discussions and proposed agreements, Met Council and State Defendants have stonewalled regarding assumed access.

It appears that Xcel's real complaint with MnDOT and the Met Council is that they have not agreed to guarantee access to its downtown substation on terms it prefers. Further, the petition does not allege that any transformer at Xcel's downtown substation has failed since the commencement of construction of the LRT line. Nor does the petition allege that Xcel has ever requested access from MnDOT or the Met Council to repair a failed transformer, or that either MnDOT or the Met Council

---

9. Although Xcel was not granted additional time to conduct discovery, nothing in its request for additional time suggests that it could have developed facts that would have changed our conclusion that the petition was premature and speculative.

have ever denied reasonable access to Fifth Street to repair one of the substation's transformers. Xcel essentially argues that the failure of the Met Council and MnDOT to provide a prospective guarantee of access on Xcel's terms amounts to a regulatory taking of its right to reasonable access to its substation. The mere failure to reach a prospective agreement for access does not equate to a denial of access. This is particularly true when negotiations, even though protracted, are ongoing and when, on the facts as presented here, no transformer has failed, no request for access has been made, and no access has been denied. We therefore conclude that the district court properly dismissed Xcel's petition with respect to its regulatory takings claim.[10]

Reversed.

Took no part: BLATZ, C.J., GILBERT, J., and HANSON, J.,
CHRISTOPHERSON, BRUCE W., J., Acting J.*

---

10. Because we hold that the failure to reach an agreement does not equate to a denial of access, we need not reach the third requirement for mandamus, that the petitioner lack a "plain, speedy, and adequate remedy in the ordinary course of law." Minn.Stat. § 586.02. We note, however, that, because of the time required for site preparation preliminary to Xcel placing a crane on Fifth Street,

Xcel would have ample time to seek a temporary restraining order if MnDOT or the Met Council ever denied it access for the purpose of repairing a transformer.

* Appointed pursuant to Minn. Const. art. VI, § 2, and Minn.Stat. § 2.724, subds. 1, 2 (2002).