**MENDOTA GOLF, LLP, Respondent,**

v.

**CITY OF MENDOTA HEIGHTS, Appellant.**

No. A04–206.

Supreme Court of Minnesota.

Jan. 10, 2006.

Clifford M. Greene, Robin M. Wolpert, Greene Espel, P.L.L.P., Minneapolis, Pierre N. Regnier, Jessica E. Schwie, Jardine, Logan & O'Brien, P.L.L.P., Lake Elmo, Daniel S. Schleck, Winthrop & Weinstine, P.A., Minneapolis, for appellant.

S. Todd Rapp, Eagan, for respondent.

## OPINION

ANDERSON, PAUL H., Justice.

Appellant City of Mendota Heights appeals from a Minnesota Court of Appeals decision affirming a Dakota County District Court writ of mandamus, which compels the city to amend its comprehensive plan to allow respondent Mendota Golf, LLP, to turn its golf course property into a residential development. We reverse, concluding that the city did not have a clear duty to amend its comprehensive plan and the city had a rational basis to deny Mendota Golf's proposed amendment to the comprehensive plan. However, because we conclude that there is a conflict between the city's comprehensive plan and the city's zoning ordinance that has not been reconciled as required by Minn.Stat. § 473.858, subd. 1 (2004), we remand to the district court to issue an order directing the city to reconcile the comprehensive plan and zoning ordinance provisions.

Mendota Golf, LLP, owns a 17.5–acre tract of real property located at the intersection of Dodd Road and Bachelor Avenue in the City of Mendota Heights. Since the early 1960s, the property has been used and operated as a nine-hole par 3 golf course. At present, the character of the neighborhood surrounding the property is residential.

When Mendota Golf acquired the property in January 1995, the city's zoning ordinance designated the property as Residential (R–1 One–Family Residential), while the city's comprehensive plan designated the property as "Golf Course" (GC). At that time, the Metropolitan Land Planning Act (MLPA) provided that a city's zoning designations took priority over conflicting comprehensive plan designations. Minn.Stat. § 473.858, subd. 1 (1994). In R–1 one-family residential districts, "[o]ne-family detached dwellings" are a permitted use and golf courses are a conditional use. The comprehensive plan and zoning designations for the property have not changed since 1995. Mendota Golf asserts that it purchased the property with the understanding that if the golf course proved unprofitable, it had the "safety net of developing the Land Parcel at some later point in time."

During the 1995 legislative session, the legislature amended the MLPA by adding a provision directing local government units to reconcile conflicts between comprehensive plans and zoning ordinances. Act of May 17, 1995, ch. 176, § 5, 1995 Minn. Laws 593, 594–95. The amended statute, which became effective on August 1, 1995, provides in relevant part:

> If the comprehensive municipal plan is in conflict with the zoning ordinance, the zoning ordinance shall be brought into conformance with the plan by local government units in conjunction with the review, and, if necessary, amendment of its comprehensive plan required under

section 473.864, subdivision 2.[1] After August 1, 1995, a local government unit shall not adopt any fiscal device or official control which is in conflict with its comprehensive plan, including any amendment to the plan, or which permits activity in conflict with metropolitan system plans * * *.

Minn.Stat. § 473.858, subd. 1 (2004) (footnotes added). The amended statute also provides that an official control "shall not be considered to be in conflict with a local government unit's comprehensive plan" if the official control "is adopted to ensure the planned, orderly, and staged development of urbanization or redevelopment areas designated in the comprehensive plan." *Id.*[2]

Mendota Heights asserts that it "has a long history and commitment to planning which has resulted in unique residential living environments and business centers." The city adopted its first land use plan in 1960, even before the MLPA went into effect and required communities to do such planning. The 1960 plan focused on "high quality residential neighborhoods, open space and parks and well-planned commercial and industrial areas."

In 1979, the city adopted a comprehensive plan that incorporated regional policies and guidelines under the MLPA. The 1979 comprehensive plan placed the subject property in the land use category "(GC) Golf Course" and "guided" the land on all sides of the property as Low–Density Residential. At the time, single-family residential development surrounded the property to the north, south, and west, but

the land across Dodd Road to the east was undeveloped.

The city's 1979 comprehensive plan also set forth certain planning goals, which were reaffirmed in 2002. The goals from the 1979 plan that are most relevant to this case are: (1) maintaining the community character and identity; (2) resisting the deterioration of the environment; (3) maintaining the existing residential areas; (4) providing the optimum amount of active and passive open space for the enjoyment of all of the city's residents; (5) encouraging the preservation of open space in the community by private property owners in a manner consistent with the comprehensive plan; (6) encouraging planned usage of existing private recreational facilities in order to avoid duplication and promote maximum enjoyment of all citizens in the city; (7) providing each neighborhood in the city with open space; and (8) preserving and enhancing the natural beauty, uniqueness, and attractive appearance of the community.

The city adopted the 2002 comprehensive plan after engaging in a three-year review process during which several public hearings were held. When the city adopted the 2002 comprehensive plan, it reaffirmed that its goals and policies remain consistent with its original vision for development. Included among the 2002 goals and policies is the preservation of green spaces, open spaces, and recreational facilities.

Low–Density Residential (LR) is the most prevalent land use category in the 2002 comprehensive plan. Land designat-

---

1. This section of the statute provides that local governments shall review and, if necessary, amend their comprehensive plans and fiscal devices and official controls by December 31, 1998, and at least once every 10 years thereafter. Minn.Stat. § 473.864, subd. 2 (2004).

2. The amended statute applies to local government units within the seven-county metropolitan area. Act of May 17, 1995, ch. 176, § 12, 1995 Minn. Laws 593, 598. Mendota Heights is located in Dakota County and is subject to the statute.

ed as LR may be developed with single-family residences at a density of not more than 2.9 units per acre. The corresponding zoning classifications for LR are all One–Family Residential: R–1, R–1B, and R–1C. Other land use categories in the comprehensive plan include Commercial (LB and B), Industrial (I), Mixed Use—Planned Unit Development (MU—PUD), Public (PUB), Open Space (OS), Institutional (INS), and Golf Course (GC).

As part of its process of updating the comprehensive plan, the city "reviewed a number of parcels within the community for consistency between the Zoning Map and Comprehensive Land Use Plan." The city apparently was anticipating the possibility that the character of some of these parcels would change. These parcels were designated as "Infill Sites" in the city's Technical Plan. Mendota Golf's property is one of the parcels designated as an infill site. The Technical Plan indicates that the zoning designation for the property is R–1 and states:

> This site is currently a par–3 golf course and is guided as GC. This designation is proposed to remain. In the event that future redevelopment of this site is contemplated, careful consideration would need to be given to develop the

site in a manner consistent with and sensitive to the existing low-density residential neighborhood.

Despite published notice of the city's plans to revise its comprehensive plan, Mendota Golf did not appear before the city to request alternate "guiding" of the property.

Under the 2002 comprehensive plan, all three golf courses in the city, including Mendota Golf's property, are designated as "Golf Course." According to the comprehensive plan:

> The Golf Course land use designation is intended to distinguish the commercial/recreation/open space characteristics associated with golf courses. The corresponding zoning district classifications are R–1, R–1A (One Family Residential) and R–2 (Medium Density Residential District).[3]

Under the city's zoning ordinance, golf courses are a conditional use within these residential districts. The city apparently has not taken any steps to create a special zoning district classification for golf courses that corresponds to the Golf Course land use designation in the comprehensive plan.[4]

---

3. Mendota Golf's property, as well as the city's two other golf courses, are identified in the city's Park Plan as "open space."

4. When a local governmental unit submits its comprehensive plan to the Metropolitan Council, it must either certify that "no amendments to its plan or fiscal devices or official controls are necessary" or submit the amendments to the Metropolitan Council for information purposes. Minn.Stat. § 473.864, subd. 2 (2004). The implementation program of the city's comprehensive plan indicates that "[m]inor revisions" to the city's zoning ordinance "may be needed to address the development and policy issues identified in the Comprehensive Plan." However, the city's Technical Plan also expresses "concern" re-

garding the city's obligations under the 1995 amendments to the MLPA:

> Up until passage of the amendments to the Metropolitan Land Planning Act in 1995, zoning took precedence over comprehensive planning when issues of inconsistencies occurred. However, the amended Act now provides that comprehensive plans shall take precedence over zoning when conflicts arise. The change presents challenges due to the fact that comprehensive plans have traditionally served as "guide" plans. Prior to establishing a land use plan and/or modifying existing land use designations, the City must fully understand potential ramifications of these actions. There is currently no case law to provide guidance in this matter. At issue is a lack of understanding

In 2003, Mendota Golf decided to sell its property to a developer that planned to dismantle the golf course and build single-family homes. Mendota Golf entered into a purchase agreement with the developer that conditioned the sale of the property on "the buyer's obtaining necessary governmental approvals for proposed residential development." The developer's proposed residential development would eliminate the open space and recreational uses that the property presently provides to the city.

After entering into the purchase agreement, the developer submitted to the city a concept plan for a residential subdivision on the property. According to the minutes of the city council meeting at which the concept plan was considered, the mayor and several council members indicated that they would not support a change in the city's comprehensive plan to allow residential development of the property. The city did not take any formal action on the concept plan.

Mendota Golf subsequently submitted an application to the city requesting that the city amend the comprehensive plan to change the designation of the property from "Golf Course" to "Low Density Residential." In a letter attached to the application, Alan Spaulding, one of Mendota Golf's partners, indicated that Mendota Golf had failed to make the golf course "a profitable venture" and needed to "pursue alternative uses." Spaulding stated that when Mendota Golf purchased the property in 1995, it understood that it had the opportunity to develop the property. However, due to a subsequent change in the MLPA, which Spaulding described as requiring developers to "meet the criteria of both Zoning and Comprehensive Plan"

designations, Mendota Golf is "now subject to the confining designation of 'Golf Course' on the Comprehensive Plan." Spaulding explained a "series of financial challenges and setbacks" that Mendota Golf had experienced and emphasized that Mendota Golf has been "a good neighbor" to the community. Spaulding asked the city to give it "more flexibility than the designation of 'Golf Course' allows" and to "restore the rights" Mendota Golf had when it acquired the property.

On June 11, 2003, the city advised Mendota Golf that its application to amend the comprehensive plan was complete. Shortly thereafter, the city's consulting planner prepared a planning report and recommended that "an alternative land use designation for the site is appropriate, subject to qualified review of the information provided by the applicant as to the viability of a golf course operation on the property." On June 24, 2003, the city's planning commission held a public hearing, evaluated Mendota Golf's application, and unanimously (one commissioner abstained) recommended that the city council deny the proposed amendment to the comprehensive plan. The planning commission based its recommendation on a finding that "the golf course is the best use of the property consistent with the surrounding use of the neighborhood."

Mendota Golf's application to amend the comprehensive plan came before the city council on July 1, 2003. The council acknowledged receiving various documents, including staff reports and the letter from Spaulding. According to the minutes of the council meeting, Spaulding told the council that the highest and best use for the property is not as a golf course, "the

of the implications of this law and the mechanisms available to the City to assure that the Mendota Heights Comprehensive

Plan is consistent with the Zoning Ordinance.

character of the neighborhood is consistent with single family use of the site," and it is not fair that Mendota Golf has to satisfy the conditions of both the comprehensive plan and the zoning ordinance, unlike other property owners in the city. Spaulding also indicated that the comprehensive guide plan is arbitrary and contradictory to zoning.

A city attorney advised the council that after the legislature amended Minn.Stat. § 473.858 in 1995, a local government cannot adopt any official control that conflicts with the comprehensive plan, and it "is pretty clear that the comprehensive plan controls." The mayor commented that a few years previously the council had updated the city's comprehensive plan and held many public hearings. A councilmember added that the plan updating process was very extensive. When the mayor noted that Mendota Golf chose not to participate in the process even though the law changed, Spaulding responded that Mendota Golf was not aware of the hearings. The mayor then solicited comments from citizens in the audience. Several citizens spoke out against the proposed comprehensive plan amendment, with some speaking on the value of preserving open space and recreational opportunities in the community.

The city council then voted unanimously to adopt Resolution 03–46, denying the proposed comprehensive plan amendment. In the resolution, the council stated that the amendment would have an "adverse impact on the health, safety, and general welfare of the citizens of the community and the surrounding land, and would be adverse to the general purpose and intent of the Zoning Ordinance."

After the city council denied the comprehensive plan amendment, Mendota Golf brought a mandamus action in district court. Mendota Golf asserted that the city's zoning code provision applicable to its property expressly permits single-family residences; the "Golf Course" designation in the comprehensive plan has no direct corresponding zoning classification; and the comprehensive plan designation and the zoning classification for the property are incompatible. Mendota Golf further asserted that the city's "failure and refusal to approve Mendota Golf's application to amend the Comprehensive Plan Land Use designation of the property to 'LR, Low–Density Residential' from 'GC, Golf Course,' at such a time as the Property is and has been zoned 'R–1 One–Family Residential,' constitutes an arbitrary, irrational, capricious, illegal, and unconstitutional act." Mendota Golf requested that the court issue a writ of mandamus commanding the city to approve Mendota Golf's application for an amendment to the city's comprehensive plan.

After a hearing, the district court concluded that the city's denial of Mendota Golf's proposed amendment to the city's comprehensive plan was arbitrary, capricious, and without a rational basis. The court found that: (1) the proposed Low–Density Residential designation corresponds to the existing R–1 zoning of the property; (2) single-family residential use is expressly made a permissible use under the existing R–1 zoning designation; and (3) the city had made no attempts to bring the property's zoning into conformity with the comprehensive plan "which in any way would prohibit the use of the subject property for R–1 zoning." The court then entered judgment in favor of Mendota Golf and against the city and issued a writ of mandamus commanding the city to immediately "approve Petitioner's application for a Comprehensive Plan amendment changing the Land Use Guide Plan designation of the Property from 'GC' Golf Course to 'LR' Low–Density Residential," and to further submit the Comprehensive

Plan amendment to the Metropolitan Council for review and approval.

The city appealed, and the court of appeals affirmed the district court. *Mendota Golf, LLP v. City of Mendota Heights,* No. A04–206, 2004 WL 2161422 (Minn.App. Sept.28, 2004). The court of appeals determined that "[t]he city failed in its statutory duty to reconcile the designations for the golf course contained in the city's comprehensive plan and its zoning ordinance"; the city's "comprehensive plan contains a peculiar provision stating that the primary authority for development decisions is the zoning ordinance"; and there is a "logical inconsistency" in the city's refusal to allow Mendota Golf to use the land for a purpose that is expressly allowed under the zoning designation. *Id.* at *2, 4. Accordingly, the court of appeals concluded that the district court did not err by "directing the city to satisfy its statutory obligation of reconciling the discrepancy between its comprehensive-plan designation of the land and its zoning-ordinance designation of the land by starting the process to amend the comprehensive plan." *Id.* at *2. In reaching its decision, the court of appeals considered only the city council's stated reasons for its decision, not any "unarticulated possible reasons," stating that "this is an appeal from the district court's mandamus decision, not a decision in a municipal zoning matter." *Id.* at *3.

## I.

■■■ "Mandamus is an extraordinary legal remedy." *State v. Pero,* 590 N.W.2d

319, 323 (Minn.1999). "The authority to issue a writ of mandamus is statutory." *State v. Wilson,* 632 N.W.2d 225, 227 (Minn.2001); *see* Minn.Stat. §§ 586.01– 586.12 (2004).[5] The two primary uses of mandamus are (1) to compel the performance of an official duty clearly imposed by law and (2) to compel the exercise of discretion when that exercise is required by law. *See* Minn.Stat. § 586.01; *N. States Power Co. v. Minn. Metro. Council,* 684 N.W.2d 485, 491 (Minn.2004). However, a writ of mandamus does not control the particular manner in which a duty is to be performed and does not dictate how discretion is to be exercised. *See, e.g., State v. Davis,* 592 N.W.2d 457, 459 (Minn.1999); *State ex rel. S. St. Paul v. Hetherington,* 240 Minn. 298, 301, 61 N.W.2d 737, 740 (1953); *State ex rel. Laurisch v. Pohl,* 214 Minn. 221, 226, 8 N.W.2d 227, 231 (1943). In addition, a writ of mandamus "shall not issue in any case where there is a plain, speedy, and adequate remedy in the ordinary course of law." Minn.Stat. § 586.02.

■■■ To determine whether mandamus is available here, we first address whether the city failed to perform a duty clearly imposed by law when it denied Mendota Golf's application for an amendment to the city's comprehensive plan. Mendota Golf's mandamus action is based on the city's duty under Minn.Stat. § 473.858, subd. 1, to reconcile conflicts between the city's comprehensive plan and the zoning ordinance. This subdivision of the MLPA provides:

> Minn.Stat. § 586.03. Peremptory writs may be allowed in the first instance only when the right to require performance of the act is clear and no valid excuse for nonperformance can be given. Minn.Stat. § 586.04. "In all other cases the alternative writ shall first issue." *Id.* In this case, the type of writ does not appear to influence the reasoning or the result in any way.

5. The city notes that there is an inconsistency here between the type of writ of mandamus originally requested and the type of writ issued. Mendota Golf originally petitioned the district court for an alternative writ of mandamus, but the district court issued a peremptory writ. An alternative writ of mandamus permits a defendant to answer the petition and show cause for not complying with the writ, while a peremptory writ does not. *See*

If the comprehensive municipal plan is in conflict with the zoning ordinance, the zoning ordinance shall be brought into conformance with the plan by local government units in conjunction with the review and, if necessary, amendment of its comprehensive plan required under section 473.864, subdivision 2.

Minn.Stat. § 473.858, subd. 1 (2004). Mendota Golf asserts that the city's comprehensive plan and its zoning ordinance are "not in conformity" with respect to Mendota Golf's property and that the proposed amendment to the comprehensive plan "would provide the lacking conformity." The city denies that its comprehensive plan is in conflict with its zoning ordinance. Therefore, before proceeding any further, we must resolve the issue of whether a conflict exists.

The MLPA provides little guidance in determining when a comprehensive municipal plan is in conflict with a zoning ordinance. The MLPA does provide that an official control "shall not be considered to be in conflict with a local government unit's comprehensive plan" if the official control "is adopted to ensure the planned, orderly, and staged development of urbanization or redevelopment areas designated in the comprehensive plan." Minn.Stat. § 473.858, subd. 1. Unfortunately, this provision does not help in resolving the issue presented in this case because the property here is not designated in the city's comprehensive plan as an urbanization or redevelopment area.

As stated earlier, Mendota Golf's property is located in a "One–Family Residential District" under the city's zoning ordinance, but is designated "Golf Course" in the city's comprehensive plan. Mendota Golf argues that these designations conflict because single-family housing is a permitted use under the zoning ordinance, yet the comprehensive plan Golf Course desig-

nation "prevents implementation of the existing permitted low-density residential zoning use." The city acknowledges that Mendota Golf's proposed *use* of the property conflicts with the comprehensive plan, but contends that the zoning ordinance and comprehensive plan designations are not inherently contradictory because golf courses are allowed in residential zones with a conditional use permit and Mendota Golf's property has been used as a golf course since the early 1960s.

As a preliminary matter, we note that "[a] zoning statute or ordinance is one which, by definition, regulates the building development and uses of property." *In re Denial of Eller Media Company's Applications*, 664 N.W.2d 1, 8 (Minn.2003); *see* Minn.Stat. § 462.352, subd. 15 (2004) (defining "official controls" under the Municipal Planning Act as ordinances and regulations that control the physical development of a city and "implement the general objectives of the comprehensive plan"). Generally, we narrowly construe any restrictions that a zoning ordinance imposes upon a property owner. *See, e.g., Frank's Nursery Sales, Inc. v. City of Roseville*, 295 N.W.2d 604, 608–09 (Minn.1980) ("We must give weight to the interpretation that, while still within the confines of the term, is least restrictive upon the rights of the property owner to use his land as he wishes."). Consequently, "restriction[s] on land use must be clearly expressed." *Chanhassen Estates Residents Ass'n v. City of Chanhassen*, 342 N.W.2d 335, 340 (Minn.1984). *See generally* 3 Kenneth H. Young, *Anderson's American Law of Zoning* § 18.04 (4th rev. ed.1996) (stating that "[t]he consistent emphasis of the courts is upon the right of a landowner freely to use his property unless the limitations imposed upon such use are clearly articulated"). In addition, by statute, zoning regulations must be "uniform for each class or kind of

buildings, structures, or land and for each class or kind of use throughout [a zoning] district." Minn.Stat. § 462.357, subd. 1 (2004).

▇▇▇ In this case, Mendota Golf's property is located in a one-family residential district that specifically allows "[o]ne-family detached dwellings" as a permitted use. Mendota Heights, MN, City Code § 12–1E–3 (2005); *see Chanhassen Estates Residents Ass'n*, 342 N.W.2d at 340 (explaining that subject to compliance with specific requirements, regulations, and standards, a city's approval of a permitted use generally follows as a matter of right). In contrast, the comprehensive plan designation allows the property to be used only as a golf course. While the use allowed by the comprehensive plan may be allowed as an exception under the zoning ordinance, the primary use allowed by the zoning ordinance is prohibited by the comprehensive plan. We view this as a conflict.

Mendota Golf does not dispute that under the MLPA, the comprehensive plan controls, and the property can be used only as a golf course.[6] Consequently, Mendota Golf is subject to the most restrictive use of its property, and the zoning ordinance does not clearly express the restrictions imposed upon the property. In fact, it appears that the R–1 zoning designation for the property has no real significance if the property can be used only as a golf course and cannot be used for residential purposes. Further, the comprehensive plan designation creates a situation where Mendota Golf does not enjoy the same rights to use its property as other property owners within the city's R–1 zoning district. This disparity appears to offend

the spirit of the uniformity requirement by denying Mendota Golf a use of its property that is expressly permitted as to other property owners in the zoning district. For these reasons, we conclude that there is a conflict between the city's comprehensive plan and the zoning ordinance, which the city was required to resolve under Minn.Stat. § 473.858, subd. 1.

## II.

▇▇▇ The writ of mandamus in this case requires the city to reconcile the foregoing conflict by amending the comprehensive plan from its "GC" Golf Course designation to "LR" Low–Density Residential. The city contends that the writ of mandamus "improperly divests the City Council of its constitutionally-based legislative authority to determine local land uses." Therefore, we next consider whether the city had a clear duty to resolve the conflict by amending the comprehensive plan to permit the development of single-family housing on Mendota Golf's property. *See* Minn.Stat. § 586.01 (providing that a writ of mandamus may be issued "to compel the performance of an act which the law specially enjoins as a duty").

Under Minn.Stat. § 473.858, subd. 1, conflicts between a city's comprehensive plan and its zoning ordinance are to be reconciled either by (1) amending the zoning ordinance to conform to the comprehensive plan, or (2) by amending the comprehensive plan during one of the periodic reviews of the plan. Minn.Stat. § 473.858, subd. 1. The city asserts that the district court's writ of mandamus is problematic because the court directs the city to resolve the conflict in a specific way—by

**6.** Mendota Golf states that it "does not take issue with the general proposition that, since 1995, municipal comprehensive plans are intended to 'trump' inconsistent local ordinances, including zoning ordinances" and

acknowledges that the "Golf Course" comprehensive plan designation for the property prevents the development of single-family housing on the property. *See* Minn.Stat. § 473.858, subd. 1, and discussion *infra* at II.

amending the comprehensive plan—even though there are alternative ways that the city could reconcile the conflict. According to the city, specific examples of how the conflict can be resolved include the following:

> The City could bring the zoning ordinance into conformity with the plan, it could bring the plan into conformity with the ordinance, or the City could choose to redesignate the property in a manner different from the property's current designation in either the plan or the ordinance.

Even Mendota Golf acknowledges that there is more than one way to resolve the conflict.

"The Minnesota legislature has delegated to municipalities the power to determine and plan the use of land within their boundaries." *VanLandschoot v. City of Mendota Heights*, 336 N.W.2d 503, 507 (Minn.1983); *see* Minn.Stat. § 462.351 (2004) (stating that the purpose of the Municipal Planning Act is to provide municipalities "with the necessary powers" to conduct and implement municipal planning).[7] A comprehensive plan contains "objectives, policies, standards and programs to guide public and private land use, development, redevelopment and preservation for all lands and waters within the jurisdiction of the local governmental unit." Minn.Stat. § 473.859, subd. 1 (stating contents of comprehensive plan). Because land use planning and regulation are within a city's legislative prerogative, the city has broad discretion when it makes decisions in that arena. *See Honn v. City of Coon Rapids*, 313 N.W.2d 409, 414 (Minn.1981) (stating that "a municipality acts in a legislative capacity" in adopting

or amending a zoning ordinance, "regardless of the size of the tract involved").

Here, the presence of alternative ways to reconcile the conflict between the comprehensive plan and the zoning ordinance indicates that the city did not have a clear duty to amend the comprehensive plan to conform to the zoning ordinance. Accordingly, we conclude that the district court exceeded the scope of its authority in this mandamus action by interfering with the exercise of legislative discretion and ordering the city to reconcile the conflict in a specific way—by amending the comprehensive plan. *See State ex rel. Gresham v. Delaney*, 213 Minn. 217, 219, 6 N.W.2d 97, 98 (1942) (explaining that mandamus may be used to compel public officers "to perform duties with respect to which they plainly have no discretion as to the precise manner of performance and where only one course of action is open"); *Pohl*, 214 Minn. at 227, 8 N.W.2d at 231 (stating that "courts do not undertake to control the manner in which official acts of a discretionary nature are to be performed"); *cf.* 3 Edward H. Ziegler, Jr., Arden H. Rathkopf & Daren A. Rathkopf, *Rathkopf's The Law of Zoning and Planning* § 56:2 (4th ed. 1997 & Supp. 11/2001) (stating that "since zoning is a legislative function, it is beyond the judicial power to rezone property from one classification to another").

We also conclude that the district court's writ of mandamus commanding the city to bring its comprehensive plan into conformity with its zoning ordinance is inconsistent with the statutory priority of comprehensive plans over zoning ordinances. Under the MLPA, the comprehensive municipal plan guides land use in cities within the metropolitan area. Minn.

---

7. *But see* Minn.Stat. § 473.175, subd. 1 (2004) (providing that the Metropolitan Council "may require a local governmental unit to modify any comprehensive plan" if "the plan is more likely than not to have a substantial impact on or contain a substantial departure from metropolitan system plans").

Stat. § 473.859, subd. 1 (2004). Zoning ordinances are intended to carry out the policies of a city's comprehensive plan. *See* Minn.Stat. § 473.851, subd. 9 (2004); Minn.Stat. § 473.859, subd. 4 (2004) (requiring a comprehensive plan to have an "implementation program" that includes "a description of official controls" that may be used to implement the comprehensive plan).

 Since 1995, the MLPA has provided that the comprehensive plan constitutes the primary land use control for cities and supersedes all other municipal regulations when these regulations are in conflict with the plan. *See* Minn.Stat. § 473.858, subd. 1 (providing that "the zoning ordinance shall be brought into conformance with the [comprehensive municipal] plan" if there is a conflict).[8] The MLPA further prohibits cities from adopting any "official control which is in conflict with its comprehensive plan, including any amendment to the plan." Minn.Stat. § 473.858, subd. 1; *accord* Minn.Stat. § 473.865, subd. 2 (2004). Consequently, there is no statutory support for ordering the city to amend its comprehensive plan to conform to the zoning ordinance. Further, the nature of the order itself—directing the city to bring its comprehensive plan into conformity with its zoning ordinance—appears to violate the MLPA because this approach undermines the su-

premacy of the comprehensive plan vis-à-vis the zoning ordinance.

We further note that a city's comprehensive plan is part of a regional land use planning process. Because "local governmental units within the metropolitan area are interdependent," the legislature has established "requirements and procedures to accomplish comprehensive local planning with land use controls consistent with planned, orderly, and staged development and the metropolitan system plans." Minn.Stat. § 473.851 (2004); *see generally City of Lake Elmo v. Metro. Council*, 685 N.W.2d 1, 5–6 (Minn.2004) (explaining that the Metropolitan Council reviews local comprehensive plans and has broad authority to require modification of plans that are inconsistent with the council's overarching plan). Although the writ of mandamus in this case did require the city to submit the comprehensive plan amendment to the Metropolitan Council for review and approval, the role of the Metropolitan Council in coordinating local land use planning, including "regional recreational open space," through the development of "metropolitan system plans" further suggests that mandamus is not appropriate to compel the city to amend its comprehensive plan in these circumstances. *See* Minn.Stat. § 473.852, subd. 8 (2004) (defining "metropolitan system plans").

**8.** The court of appeals indicated that a "peculiar provision" of the city's comprehensive plan essentially trumped that statute. The "peculiar provision" that the court of appeals referred to reads as follows:
The Mendota Heights Zoning and Subdivision Ordinances will be the primary regulations governing future land use and development decisions.
The court of appeals interpreted this provision to provide that whenever there is a conflict between the comprehensive plan and the zoning ordinance, the zoning ordinance shall prevail. *Mendota Golf*, 2004 WL 2161422, at

*2. But the provision also goes on to state that "as a *means of implementing the stated land use goals* for [the city], the City may implement the following Zoning Ordinance provisions." (Emphasis added.) Thus, the provision indicates that the comprehensive plan provides the planning element, or the "land use goals," while the zoning ordinance provides the legislative means of carrying out those goals. We conclude that the latter interpretation of the provision is more consistent with the established relationship between comprehensive plans and zoning ordinances.

### III.

Although Mendota Golf appears to accept that the city did not have a clear duty to amend the comprehensive plan, Mendota Golf argues that the writ of mandamus is appropriate because the city acted arbitrarily and capriciously "by failing to adopt a rational justification for denial" of the comprehensive plan amendment, which would have eliminated the "unlawful conflict" between the city's comprehensive plan and the zoning ordinance. The city emphasizes that land use policies and regulations are legislative matters, and the city's desire to retain open and recreational space and to reaffirm the recently re-enacted comprehensive plan provides a rational basis for the city's decision to deny Mendota Golf's proposed amendment to the comprehensive plan.

Neither party specifically addresses the court's role in reviewing the city's decision within the context of a mandamus action. Nonetheless, we believe that a discussion of the proper use of mandamus in municipal zoning cases is appropriate to clarify the law. In an early case explaining the proper use of mandamus, we commented on the tension that arises between "the well-settled rule that mandamus is an extraordinary remedy to be granted only in case the petition shows a clear right thereto" and our decisions concluding that mandamus is appropriate when "discretion has been exercised in a clearly arbitrary and capricious manner." *Zion Evangelical Lutheran Church v. City of Detroit Lakes*, 221 Minn. 55, 57, 21 N.W.2d 203, 205 (1945) (quotations and citations omitted). We then explained that it is only in "rare cases" that "the officials act in so clearly an arbitrary and capricious a manner that their action may be reviewed on mandamus." *Id.* at 57, 21 N.W.2d at 205 (quotations omitted).

In *Zion*, the city council denied a church's application for a building permit for a new church "on the ground 'that the construction of said church would increase the automobile traffic hazard.'" *Id.* at 58, 21 N.W.2d at 205. In determining that the facts in *Zion* did not present "one of those rare cases where there is a clear right to the remedy of mandamus," we stated:

It is well established that mandamus cannot be used for the purpose of reviewing the decision of a board or tribunal which has exercised its discretion within the jurisdiction conferred upon it by law. Here the council has acted; and, even though the reason given for its denial may appear erroneous, we cannot say that it has necessarily acted capriciously or arbitrarily. Absent arbitrariness and caprice, mandamus does not lie for mere error in the exercise of discretion. * * * [I]t is not for us in this proceeding to pass upon the merits of the ground for the denial. It would be a novelty if, after the council has determined that the granting of a permit and the erection of a building pursuant thereto would result in an increased traffic hazard, the court should upon application overrule its decision of denial. Once the council's discretion is exercised, there is no judicial remedy through mandamus. The court can compel a quasi-judicial body such as a city council to exercise discretion; but, once that discretion has been actually exercised, as here, the court is wholly without power through mandamus to compel such quasi-judicial body to reverse, reconsider, or repeat its action. This fundamental principle, repeatedly recognized by this court, is salutary and essential to the preservation of local government. The court must not substitute its judgment for that of the city council and thus usurp the function of local governing bodies.

*Id.* at 57, 58, 21 N.W.2d at 205–06. We then concluded that mandamus was not appropriate because the church had an adequate remedy at law. *Id.* at 58, 21 N.W.2d at 206.

Our land use cases following *Zion,* however, have not always been clear or consistent in defining the proper reach of mandamus. In *Curry v. Young,* 285 Minn. 387, 393–94, 173 N.W.2d 410, 413–14 (1969), we reviewed our decisions and commented that the "use of mandamus to obtain relief" in land use matters "has been denied in some cases and permitted in others." Acknowledging that "[t]hese decisions are not always easy to reconcile," we stated that "about the only rule we can glean from our cases is that mandamus ordinarily will not lie to control the exercise of discretion by administrative agencies, *but it will lie if there is no other adequate and complete remedy.*" *Id.* at 395, 173 N.W.2d at 414, 415 (emphasis added).

Later, in *Honn v. City of Coon Rapids,* 313 N.W.2d 409, 413 (Minn.1981), we observed that litigants were using "a variety of remedies for a variety of zoning cases," including "mandamus, certiorari, injunction, and the declaratory judgment action." For example, we noted that "[m]andamus has been used to review denial of a special use permit" and "for denial of a variance." *Id.* at 413 n. 3 (citing cases). In some of these cases, we strayed from our traditional view that mandamus is available only to compel a duty clearly required by law and cannot control the manner in which discretion is exercised. We also strayed from our traditional view that mandamus should be reserved for those "rare cases" involving egregious conduct where a city clearly acted in an arbitrary and capricious manner. *See Zion,* 221 Minn. at 57, 21 N.W.2d at 205; *see, e.g., C.R. Invs., Inc. v. Village of Shoreview,* 304 N.W.2d 320, 328 (Minn. 1981) (concluding that "the village acted

arbitrarily and capriciously in denying [a] special use permit for reasons which either had no factual bases or were not legally sufficient"); *Minnetonka Congregation of Jehovah's Witnesses, Inc. v. Svee,* 303 Minn. 79, 83–84, 226 N.W.2d 306, 308 (1975) (concluding that mandamus would lie to enable a property owner to secure a conditional use permit from a city to construct a church where the evidence did not support the city's council's reasons for denying the permit).

In *Honn,* we sought to clarify the procedure for reviewing municipal zoning matters. We stated that review of a decision on "any zoning matter, whether legislative or quasi-judicial," should be obtained by a declaratory judgment action in the district court. 313 N.W.2d at 416. After describing the proper procedure for review, we went on to state: "This is not to say that the form of the action by which the procedure is initiated need always be a declaratory judgment action. Mandamus has its place, and there may be a quasi-judicial proceeding presenting a legal question to which certiorari still lends itself." *Id.; see also White Bear Rod & Gun Club v. City of Hugo,* 388 N.W.2d 739, 742 (Minn.1986) (explaining that "a declaratory judgment or injunction action is generally more appropriate, or sometimes mandamus" for reviewing municipal zoning matters, but certiorari is appropriate to review "a narrow legal procedural question"). However, we have not provided any specific guidance on the "place" of mandamus in the review of municipal zoning decisions.

Following *Honn,* parties have continued to seek review of routine municipal zoning matters through mandamus actions. Further, the court of appeals has interpreted our decisions as allowing courts to issue a writ of mandamus "even if the administrative body's act was a legislative decision if the body's failure to perform 'was so arbi-

*trary and capricious as to constitute a clear abuse of discretion.'"* Hoskin v. City of Eagan, 632 N.W.2d 256, 258–59 (Minn.App.2001) (concluding that mandamus can be applied to a city's discretionary decision to deny an application to vacate public easements) (quoting *McIntosh v. Davis,* 441 N.W.2d 115, 118 (Minn.1989)) (emphasis added); *see also Curtis Oil v. City of North Branch,* 364 N.W.2d 880, 884 (Minn.App.1985) (affirming a writ of mandamus requiring a city to rezone a parcel of land where the city's denial of a rezoning application was "arbitrary"). Consequently, in practice, it appears that the "extraordinary remedy" of mandamus is being used in quite ordinary zoning matters. Moreover, mandamus is used in many cases in which an adequate remedy at law—a declaratory judgment action—is available.

■ At this point, we reiterate our guidance that the proper procedure for reviewing a city's decision in a zoning matter[9] generally will be a declaratory judgment action, possibly including a request for injunctive relief. *See Honn,* 313 N.W.2d at 416; *see also* Minn.Stat. § 462.361, subd. 1 (2004) (providing for judicial review of municipal planning or zoning decisions in the district court); Minn.Stat. § 555.01 (2004) ("Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed."). *But cf. Interstate Power Co. v. Nobles County Bd. of Comm'rs,* 617 N.W.2d 566, 574 & n. 5 (Minn.2000) (clarifying that

quasi-judicial zoning decisions of a *county* board are reviewable by writ of certiorari based on a "narrow exception" that "exists because the legislature has not provided for judicial review of zoning decisions of county boards in the district court as it has for zoning decisions of cities, towns and even county boards of adjustment").

■ While there are municipal zoning matters for which mandamus may be appropriate, these cases typically involve claims that a city failed to perform a clearly defined duty that is required by a statute or zoning ordinance. *See, e.g., Glen Paul Court Neighborhood Ass'n v. Paster,* 437 N.W.2d 52, 57 (Minn.1989) (concluding that a city's failure to comply with a statutory requirement of mailed notice to property owners rendered an amendment to the city's zoning ordinance invalid); *Advantage Capital Mgmt. v. City of Northfield,* 664 N.W.2d 421, 427–28 (Minn.App. 2003) (reviewing a writ of mandamus that required a city to issue a building permit where the petition was based on the claim that the city failed to grant or deny the building permit within the time limits prescribed by statute), *rev. denied* (Minn. Sept. 24, 2003); *cf. Chanhassen Estates Residents Ass'n v. City of Chanhassen,* 342 N.W.2d 335, 340–41 (Minn.1984) (directing a city to issue a building permit where the proposed facility was a permitted use under the city's zoning ordinance and the permit application complied with the specific requirements, regulations, and standards prescribed by the ordinance).[10] "Courts generally agree that [a petitioner]

9. We use "zoning" in a broad sense to encompass a municipality's land use decisions under its zoning ordinances and rules, *see* Minn. Stat. § 473.852, subd. 9 (defining "official controls"), as well as its comprehensive plan.

10. In addition, we have indicated that "[a]ctions for inverse condemnation may appropriately be brought by writ of mandamus." *N.*

*States Power,* 684 N.W.2d at 491; *accord Dale Properties, LLC v. State,* 638 N.W.2d 763, 765 (Minn.2002) ("Property owners who believe the state has taken their property in the constitutional sense may petition the court for a writ of mandamus to compel the state to initiate condemnation proceedings.").

in a mandamus action must demonstrate a clear legal right to have the act in question performed and must demonstrate every material fact necessary to show the existence of the plain duty to act with respect to the relief sought." 4 *Rathkopf's The Law of Zoning and Planning, supra,* § 64:4.

In contrast to cases involving a city's failure to perform a clearly defined duty, mandamus is not appropriate to review the exercise of legislative discretion in municipal zoning matters. As we stated in *Zion,* "mandamus does not lie for mere error in the exercise of discretion." 221 Minn. at 58, 21 N.W.2d at 205; *see also* 4 *Anderson's American Law of Zoning, supra,* § 28.08 ("Mandamus is not available to compel the legislative authority of a municipality to amend a zoning ordinance."); 8A *McQuillan The Law of Municipal Corporations* § 25.307 (3d ed.) ("Mandamus proceedings cannot be used to interfere with the discretion of zoning authorities."); 4 *Rathkopf's The Law of Zoning and Planning, supra,* § 64:6 (explaining that "[t]he clear legal duty to act which evokes a right to mandamus" does not arise with respect to an act that "principally involves the exercise of judgment and discretion"). We discern no basis for treating municipal zoning decisions differently from other kinds of discretionary decisions for which mandamus is not appropriate. *See* 4 *Rathkopf's The Law of Zoning and Planning, supra,* § 64:1 n. 3 (stating "the application and restrictions upon the use of a writ of mandamus do not differ in cases involving land use and land use regulations"). The same concerns about respect for the legislative authority of local government bodies apply.

Accordingly, we reject Mendota Golf's suggestion that "the propriety" of the district court's issuance of the writ of mandamus in this case is "clear." Rather, we conclude that a mandamus action generally is not appropriate to review claims that a city acted arbitrarily and capriciously in denying a proposed amendment to a comprehensive plan.

IV.

In this case, however, the city has not specifically challenged the appropriateness of mandamus to review the denial of Mendota Golf's proposed comprehensive plan amendment. The city's omission is understandable given the confusion that has persisted regarding the proper use of mandamus in municipal zoning cases. Although the city does argue that the district court exceeded its powers by issuing a writ of mandamus that directs the city to exercise its legislative authority in a specific manner, the city's primary argument in this appeal is that Mendota Golf is not entitled to relief because the city had a rational basis for its decision. Therefore, rather than requiring Mendota Golf to restate its claims in a declaratory judgment action, we will consider the substance of the parties' arguments and determine whether the city abused its discretion by denying the proposed comprehensive plan amendment. *Cf. Scherger v. N. Natural Gas Co.,* 575 N.W.2d 578, 579 n. 1 (Minn. 1998) (noting that "[t]he essence of this action was [a] request for a judicial declaration as to the scope and validity of [an] agreement, and therefore was not appropriate for a writ of mandamus," but stating that "we need not correct the procedure").

When reviewing municipal land use decisions, we typically utilize a rational basis standard of review.[11] *Honn,*

---

11. The city proposes that we adopt "the 'change or mistake' doctrine" in reviewing a

city's decision to deny a comprehensive plan amendment. Under the city's proposed

313 N.W.2d at 414–15. Our scope of review is narrow. *Id.* at 414. We uphold a city's land use decision unless the party challenging that decision establishes that the decision is " 'unsupported by any rational basis related to promoting the public health, safety, morals, or general welfare.' " *Id.* at 414–15 (quoting *State by Rochester Ass'n of Neighborhoods v. City of Rochester*, 268 N.W.2d 885, 888 (Minn. 1978)). "[E]ven if the city council's decision is debatable, so long as there is a rational basis for what it does, the courts do not interfere." *Id.* at 415. We do not give any special deference to the conclusions of the lower courts, but rather engage in an independent examination of the record and arrive at our own conclusions as to the propriety of the city's decision. *Northwestern College v. City of Arden Hills*, 281 N.W.2d 865, 868 (Minn.1979). Our review focuses "on the legal sufficiency and factual basis for the reasons given." *Swanson v. City of Bloomington*, 421 N.W.2d 307, 313 (Minn.1988).

 In this case, Mendota Golf, as well as the courts below, focused almost exclusively on the language in Resolution 03–46 stating that the proposed comprehensive plan amendment would have an "adverse impact on the health, safety, and general welfare of the citizens of the community and the surrounding land, and would be adverse to the general purpose and intent of the Zoning Ordinance." We conclude that focusing solely on the language of the resolution is too narrow a focus. When a municipality renders a legislative decision, we can look beyond the city's resolution and review the minutes of relevant meetings and documents considered therein to determine whether the city had a rational basis for its decision. *Cf. Crystal Beach Bay Ass'n v. County of Koochiching*, 309 Minn. 52, 55, 243 N.W.2d 40, 42 (1976) (concluding that even where findings are required a prima facie case of arbitrariness "may be rebutted if there is evidence in the recorded hearing testimony from which the reviewing court can ascertain a reasonable basis for the county board's action").

 When the municipal proceedings were fair and the record clear and complete, review is on the record. *Swanson*, 421 N.W.2d at 313. In this case, neither party disputes the district court's finding that the municipal proceedings were fair and there is "a clear record." [12]

"change or mistake" standard, the party requesting an amendment to a comprehensive plan must demonstrate either that (1) a mistake was made in the formation of the comprehensive plan or (2) the character of the neighborhood surrounding the land parcel at issue has changed so much that an amendment to the plan is merited. Although the city contends that the change or mistake standard is consistent with case law developed in the context of proposed amendments to zoning ordinance classifications, the change or mistake standard is a legal standard that a local government body may apply in considering a request for a change in a zoning ordinance, not a judicial standard of review. *See Sun Oil Co. v. Village of New Hope*, 300 Minn. 326, 335, 220 N.W.2d 256, 261–62 (1974) (noting that "there is a presumption that the original zoning was well planned and was intended to be more or less permanent") (quotations omitted); *see also Honn*, 313 N.W.2d at 417 (stating that in legislative zoning decisions, a city considers a "a wide range of value judgments" and the "inquiry focuses on whether the proposed use promotes the public welfare"). Therefore, in reviewing a city's zoning decision, a court may have occasion to assess the city's application of the "change or mistake" standard in determining whether the city had a rational basis for its decision. But the rational basis standard remains the appropriate standard of judicial review because it is most compatible with the broad discretion afforded to cities in zoning matters.

12. Because neither party has argued that the municipal record is incomplete, additional

The municipal record here includes the city council's resolution and the minutes of the planning commission and city council meetings at which the proposed comprehensive plan amendment was considered, as well as written reports and documents presented to the city council. In addition, we also may consider documents reflecting the historical designation, regulation, and character of the property.[13]

■ At the city council's meeting on Mendota Golf's proposed amendment, the mayor commented that Mendota Golf's property has been designated as golf course property in the city's comprehensive plan for over 25 years. In the 2002 comprehensive plan, which the city had adopted just one year before Mendota Golf's application to amend the comprehensive plan, the city specifically chose to retain the "Golf Course" land use designation for the property—a designation that "is intended to distinguish the commercial/recreation/open space characteristics associated with golf courses." According to the minutes of the city council meeting, the city had recently updated its compre-

hensive plan, the planning process was very extensive, including many public hearings, and Mendota Golf did not participate in any of those hearings. Comments made during the planning commission and city council meetings conveyed the value that citizens of the city place on the open space and recreational opportunities that the golf course provides.

■ A municipality has legitimate interests in protecting open and recreational space, as well as reaffirming historical land use designations. *See* Minn.Stat. § 462.357, subd. 1 (including "recreation" among the legitimate objectives of zoning); *In re Denial of Eller Media Company's Applications*, 664 N.W.2d 1, 10 n. 7 (Minn. 2003) (explaining that "[g]overning bodies have the right to meet the desires of their citizens for beauty and space—even in cities"); *Sun Oil Co. v. Village of New Hope*, 300 Minn. 326, 337–38, 220 N.W.2d 256, 263 (1974) (upholding village's denial of a rezoning petition "based upon a legislative determination to perpetuate its preexisting comprehensive zoning ordinance"). Ac-

---

discovery would not necessarily result in a "better record" as suggested by the dissent. *See Swanson*, 421 N.W.2d at 313 (concluding that in a declaratory judgment action, "the district court should receive additional evidence only on substantive issues raised and considered by the municipal body and then only on determining that the additional evidence is material and that there were good reasons for failure to present it at the municipal proceedings").

13. In the district court, Mendota Golf moved to strike certain exhibits attached to the city's verified answer to the petition for mandamus, including the city's 1959 comprehensive plan "report," the city's 1979 comprehensive plan, the city's subdivision ordinance, and other public records, arguing that they were not presented at the municipal proceedings in this case. The city responded that these exhibits are all public documents kept in the regular course of business and are matters of record

relating to Mendota Golf's property. The district court did not rule directly on the motion, but in the order allowing the writ, found that only the exhibits attached to Mendota Golf's petition, not the additional exhibits attached to the city's verified answer, "constitute, and include, the record of municipal review, below, as augmented solely by an aerial photograph of the subject premises." We believe, however, that documents reflecting the historical designation, regulation and character of the property are relevant to the city's decision to deny the proposed comprehensive plan amendment. For example, the historical use of the property, including the designation of the property in the city's 1979 comprehensive plan, was discussed during the planning commission and city council hearings. To the extent that the district court did not consider these exhibits because they were not specifically presented during the municipal proceedings in this case, we conclude that the district court erred.

cordingly, we conclude that legitimate objectives supported the city's denial of Mendota Golf's application for an amendment to the city's comprehensive plan, and Mendota Golf has failed to establish that the city lacked a rational basis for the decision. Indeed, given the statutory priority of municipal comprehensive plans over local zoning ordinances and the role of comprehensive plans in the regional planning process, it would be difficult to conclude that the city abused its discretion by denying the proposed amendment to the comprehensive plan. Therefore, we reverse the district court's decision requiring the city to approve Mendota Golf's application to change the comprehensive plan designation for the property from "Golf Course" to "Low–Density Residential."

The dissent suggests that our decision means that "the owners of the subject property are required, now and in the future, to operate a golf course because it preserves 'open space' and recreational opportunities for residents of the community." Such a suggestion indicates that the dissent has misconstrued our decision by reading it too broadly. It is not our intent, and it is not necessarily the effect of our decision, to prescribe a permanent comprehensive plan designation for the property. Our decision does not foreclose discussion and negotiation between Mendota Golf and the city regarding the use of the property. In fact, in denying the proposed amend-

ment to the comprehensive plan, the city expressed a willingness to work with Mendota Golf to explore other options for the property. Our decision also does not foreclose Mendota Golf from asserting a regulatory takings claim if the parties cannot resolve their dispute.[14] Finally, our decision does not foreclose other actions based on the circumstances as they may develop as a part of or following the city's reconciliation of the comprehensive plan and zoning ordinance provisions for the property, which cannot be foreseen at this time. Our decision simply resolves the narrow issue that is properly before the court—whether the city had a rational basis to deny Mendota Golf's proposed amendment to the comprehensive.plan.

### V.

■ As stated above, we conclude that there is a conflict between the city's comprehensive plan and zoning ordinance with respect to Mendota Golf's property and the city failed to reconcile this conflict as required under Minn.Stat. § 473.858, subd. 1. We are mindful that the power to zone has been delegated to the city council and not to the courts. Although mandamus is inappropriate "to control or interfere with the manner in which" the city exercises its discretion, mandamus can be appropriate "to set the exercise of that discretion into motion." *State ex rel. S. St. Paul v. Heth-*

---

**14.** The dissent raises the issue of a potential takings claim, but it is clear that no such claim has been asserted in this action. Counsel for Mendota Golf made clear at oral argument that Mendota Golf "specifically elected not to raise a taking issue in this case and thus no taking issue is before the court." In deciding the narrow issue presented, a discussion of the restrictions imposed on the rights of Mendota Golf by the city's comprehensive plan would be inappropriate. Mendota Golf's argument that the city lacked a rational basis for denying the proposed amendment to the comprehensive plan was based almost entire-

ly on the language that the city used in the resolution. Mendota Golf acknowledged in its brief that if the city "had acted responsibly, conscientiously, rationally, and lawfully"—for example, specifically stating in the resolution that the denial was based on the city's desire to maintain its existing land use designations—"alternative results might have been obtained." Further, we express no opinion on whether Mendota Golf might ultimately have a valid takings claim based on the proposition that the restrictions on the use of its land to a golf course constitutes a regulatory taking.

*erington,* 240 Minn. 298, 301, 61 N.W.2d 737, 740 (1953).

▆ In arguments to our court, the city has stated that "if the Court concludes that there is a conflict between the City's comprehensive plan and the zoning ordinance, the Court should remand the case instructing the lower court to amend the writ to direct the City to reconcile the conflict without depriving the City Council of its legislative discretion to determine how any conflict should ultimately be resolved." In essence, the city is not contesting its obligation to reconcile any conflicts between the comprehensive plan and the zoning ordinance and is not objecting to a remedy that permits it to exercise its discretion in resolving the conflict. Therefore, we remand to the district court to issue a writ of mandamus directing the city to reconcile the comprehensive plan and zoning ordinance provisions with respect to Mendota Golf's property as required by Minn.Stat. § 473.858, subd. 1.

Reversed and remanded.

ANDERSON, G. BARRY, Justice (concurring and dissenting).

I join in the majority opinion with respect to the conclusion that a conflict exists between the comprehensive plan and the zoning ordinance adopted by the City of Mendota Heights and I also join in the remand to the district court requiring the issuance of a writ of mandamus directing the city to reconcile the comprehensive plan and zoning ordinance provisions with respect to Mendota Golf's property as required by Minn.Stat. § 73.858, subd. 1 (2004).

I dissent, however, from that portion of the majority opinion that holds that the City of Mendota Heights had a "rational basis" for the city's denial of Mendota Golf's application for an amendment to the city's comprehensive plan.

I dissent for two reasons.

First, having concluded that a declaratory judgment action is the better vehicle for addressing the dispute between the City of Mendota Heights and Mendota Golf, I believe it is premature for this court to find a rational basis in the action taken by the City of Mendota Heights. An advantage of declaratory judgment proceedings are discovery procedures that may result in a better record than we have before this court today. Further, as a matter of judicial restraint in not deciding cases before those cases are ripe for decision, I believe the better course is to allow the City of Mendota Heights to address the conflict between the ordinance provisions because it is at least possible that the conflict will be addressed in a manner that resolves the dispute between the parties without further litigation. Further, we routinely defer to the exercise of municipal legislative authority and I see no good reason to rush in now and answer a question that may or may not be present after the ordinance conflict is resolved.

But second, I dissent from this portion of the majority opinion for substantive reasons as well.

One practical problem with the emphasis on "open space" as the basis for the city council's decision to deny the amendment request is that, as the court of appeals noted, the comprehensive plan uses separate designations for "golf course" and "open space." Indeed, preservation of "open space" is not mentioned in the city council resolution denying Mendota Golf's application for a change in the comprehensive plan.

I find the argument that the City had "several public hearings" in connection with reviewing its comprehensive plan to

be unpersuasive. I have little doubt that residents of the community were indeed interested in maintaining "recreation" opportunities and "open space," albeit at the expense of others, but the fact remains that the subject property was zoned as "golf course" both before and after those "several public hearings" and there was no reason for Mendota Golf to participate in the process absent an alternative use for the property.

In short, it is not at all clear that there is, in fact, a rational basis for the city council's decision.

In addition to these practical difficulties complicating the majority opinion's rational basis argument, there are troubling, and important, implications to the city council's decision endorsed today by the majority opinion.

While the majority opinion eloquently supports communal open space as a worthy municipal goal, entirely absent from the opinion is a discussion of the severe restrictions on the rights of the property owner as a result of the present form of the City's comprehensive plan. Put most bluntly, under the majority reading of the comprehensive plan, the owners of the subject property are required, now and in the future, to operate a golf course because it preserves "open space" and recreational opportunities for residents of the community. I do not share the confidence of the majority that we have addressed only a "narrow" question of whether the City had a rational basis to deny the request for an amendment to the City's comprehensive plan. The effect of our decision is to tell Mendota Golf, and the owner of any other similar property, that the mere assertion by neighbors that they enjoy a property owner's "open space" is sufficient to prohibit *any* (i.e., non-golf course) use of the property as long as that

preference appears somewhere in the municipal zoning ordinances.

While I acknowledge that Mendota Golf has not asserted a regulatory taking in this proceeding, municipalities cannot ignore that both the federal and Minnesota constitutions provide protection for private property rights, prohibiting the taking of public property for public use without just compensation. U.S. Const. Amend. V; Minn. Const. Art. 1, section 13. While regulatory takings are difficult to establish, Minnesota does recognize that property owners deprived of economic benefit as a result of zoning regulations are entitled, under some circumstances, to compensation for a regulatory taking. *See McShane v. City of Faribault*, 292 N.W.2d 253 (1980) (holding that airport zoning ordinance restricting use of property adjacent to the airport to agricultural use when the highest and best use had over time become commercial use constituted a taking, despite the fact that the existing use of the property was agricultural).

Perhaps, as the majority suggests, I have an "overly broad" interpretation of the effect of the opinion we issue today. Perhaps I am premature in suggesting that there might be regulatory taking implications in the actions taken by the City. But given that property rights are implicated in this dispute centering around a conflict between municipal ordinances and given that we are also now instructing litigants to use declaratory judgment procedures rather than an extraordinary writ—a fairly dramatic change from past practice—and finally given that it is wholly unnecessary to resolve the issue of whether there is a rational basis for the City's actions, I would remand this matter to the City of Mendota Heights to resolve the ordinance conflict and to allow the property owner, if desired, to commence the ap-

propriate action to properly frame the issues for decision.

BLATZ, Chief Justice (concurring and dissenting).

I join in the concurrence and dissent of Justice G. Barry Anderson.

PAGE, Justice (concurring and dissenting).

I join in the concurrence and dissent of Justice G. Barry Anderson.